We have a prior official act of the court which will take place before we hear oral arguments. It's a pleasure which the court does undertake on a regular basis and that's the admission of two new members to our bar. And because I'm making the motions I'm passing the gavel over to Judge Lynn to preside. And we're happy to entertain your motion. Thank you very much Judge Lynn. Judge Lynn, would you just allow me the pleasure of moving the admissions of two of my law clerks. Sheila Cadour, who is a member of the bar in good standing, the highest courts in Texas. And Kenneth Merber, who is a member of the bar of the state of New York, the highest courts in the state of New York. And also in the District of Columbia. Not only is it my pleasure to move their admission, but I also have to point out that as two of my elbow law clerks, and that's what law clerks used to be called, was elbow law clerks. They have performed outstanding work and we expect them to continue that excellence as the new members of this bar. So when they appear before us we can give them a hard time. And make sure that the briefs that they file are excellent and well worth reading and don't put us to sleep. Thank you very much and I move their admission to the court. No dissent having been heard, we are happy to grant your motions and to welcome both new members to the court. If you would just stand and face the clerk of the court, you can take the oath. Please raise your right hand. We swear infirmly to report yourselves as attorneys and counsels of this court, uprightly and according to law, and to support the Constitution of the United States of America. I do. Congratulations and welcome to the bar of the United States Court of Appeal. Thank you very much. The gavel is now returned to my colleague, Judge Dyers. Today we have four cases before this panel. Three of which will be heard and one submitted on the record. For the purposes of the record, the submitted case is number 2009-3036, Buell v. MSPB. The first case to be heard is 2009-1029, Inouye Bagot. Mr. Maloney, you kept five minutes for rebuttal, is that correct? Yes, I did. Whenever you are ready to start. Thank you, Your Honor. Good morning. May it please the court. Before I get started, I would like to introduce my colleagues, Ms. Tanya Drake and Mr. Thomas Brown, who have helped me in this case. This morning, I think we can cover most of the issues by looking at Claim 1 and Claim 2. Claim 1 is Mr. Bagot's invention of a novel and non-obvious way to make constructed fares. Mr. Bagot employs a specific set of pre-processing steps, which for an airline determines which interior cities that airline publishes arbitraries for, and searches a database of published fares for gateway cities corresponding to the determined interior cities. Claim 1 also includes a step of applying. The step of applying uses the results of these pre-processing steps to make the applying step more efficient. That is, the applying step uses only those interior cities that are known to appear in some arbitraries for a particular airline under consideration, and only considers those cities as gateways if the city is involved in some arbitrary whose interior city is a city currently being examined by the applying step. This arrangement allows the claim to minimize the number of retrievals of arbitraries and constructed fares, I'm sorry, arbitraries and published fares, which we believe is what is done by ATPCO and other prior art that has made constructed fares, and limits these retrievals and thereby prevents unnecessary computations and retrievals of arbitraries and published fares that in fact will not construct. Isn't it true that Gardner reference, that system calculates both published and unpublished fares? That's incorrect. It's incorrect. Gardner is a travel planning system. What Gardner attempts to do is attempts to find itineraries, which are series of flights between two points, and attempts to retrieve, not construct, but retrieve published and or unpublished fares to satisfy a particular travel requirement. In Gardner, Gardner stores unpublished fares. We believe Gardner stores something similar to what we describe in the background as ATPCO's unpublished fares product, a list of unpublished fares. There's no constructed fares that are actually constructed in Gardner. Gardner simply uses or retrieves these fares that have been most likely constructed by ATPCO. ATPCO is the agency that have developed the process of constructed fares for the airline industry. But the unpublished fares necessarily would include some component which is constructed. All unpublished fares include an arbitrary and a published fare that are combined together. The distinction between Gardner and ATPCO, as well as applicants admitted prior art, and our invention is the way in which we enumerate possible constructed fares. That is how we enumerate which arbitraries are going to be combined with which published fares. We have in our specification described two alternative approaches for doing that, which are not covered by the scope of claim one. That is the cross product, which is mentioned in the background, which is what the inventor at the time believed ATPCO was doing, and what I call the naive loop, which is the first set of pseudocode and specification, which describes a technique that would literally go through about a trillion calculations, assuming there were 1,000 airports in the world. Many of those calculations will be unnecessary because they will involve retrievals of arbitraries and published fares that cannot construct together. Whereas in our situation, when we go through claim one, we retrieve arbitraries that will construct with the published fares that are involved at that point in the process. So we don't have any unnecessary retrievals from a database or from memory of things that will not construct. Now, in the constructed fare processing, there's actually two, broadly speaking, components of this. One is enumerating these potential constructed fares, and the other is actually testing these constructed fares against fare rules, which is the bulk of what ATPCO is really describing. And if those fare rules, if the constructed fare passes those fare rules, then you have a valid constructed fare. So even in my client's invention, that other part of it, in other words, constructing valid fares involves additional processing steps, which would typically occur after what was claimed in claim one. We do mention that in our specification. We do have some claims that are devoted to improving that aspect of the fare construction process, and particularly with regard to the term memoization. That's where the memoization comes into play in terms of memoizing, not memorizing, but memoizing how the fare rules actually resulted in a fare being viewed as a valid or invalid fare. Is it your position that Gardner Reference does not disclose the determining step, the first step in claim one? Neither reference discloses that. Neither reference discloses the step of determining interior cities that appear with great gateway cities and arbitraries. But how would Gardner calculate a fare? Gardner doesn't calculate fares. Gardner simply retrieves fares. Gardner gets fares from fare providers. Nonetheless, the unpublished fare that is retrieved had to have been determined at some point, correct? That's correct. Isn't that inherent? Well, we have shown in our specification that there are at least two other ways of making unpublished fares. And if that is in fact the case, then it is not proper, I believe, under the precedence of this court, for the court to assume that the way that A.T. Pico, not Gardner, because Gardner doesn't produce constructed fares, but the way A.T. Pico produces constructed fares is the way that we produce constructed fares in claim one. So the naive loop approach, for example, which does not take into consideration this, if you will, filtering process or setting up data in a particular way, is a very inefficient algorithm. The cross-product approach is also an inefficient algorithm. Both those approaches do not use the pre-processing steps of claim one. Both of them apply an arbitrary to a published fare, but they don't apply an arbitrary to a published fare as recited in claim one. Specifically, they don't apply an arbitrary corresponding to one of the interior cities to a published fare that involves one of the gateways that is corresponding to the determined interior cities. So claim one requires, in the applying step, using the results of the two previous steps. Those two previous steps are nowhere shown in A.T. Pico or Gardner. And I would like to just point out that the board's decision rested principally upon Gardner, not A.T. Pico. Mr. Maloney, before you run out of time, I think I follow your merits discussion, and I've read your briefs. But what I'm having trouble following is the procedural side of this case, and perhaps you can help clarify for me. You group the various claims into four groups. And group four, according to your brief, is the memoization claims, which includes claim nine. Now, is claim nine before us? Is claim nine before you? I believe claim nine is not before you, because claim nine was held to be not obvious over the prior art. However, we have other claims in the case that also describe memoization, including claim 29, which was grouped with claim nine. That was my next question. That was the next question. Where is claim 29? Because claim nine was decided by the board in its original decision, but not addressed in its rehearing decision, right? So presumably because they misread memoization issue, claim nine apparently, as near as I can tell, is allowed under the original opinion. But claim 29 seems to have disappeared somewhere in the morass of verbiage in all of the briefs and in the board's opinion. I can't find what happened to claim 29. I would have thought 29 was necessarily linked to nine and either has been allowed or has not been allowed, but I can't find it. Where do you think claim 29 is? I believe claim 29 should have been allowed by the board. But it wasn't. But it was not. It was not. So is that before us? Are you appealing claim 29? How can I tell? We covered that in our briefs. We did cover that in our briefs, yes. And there's also two other claims that involve memoization, which we've covered in our briefs, which I believe should also have been allowed. Well, 20, you're talking about 20 and 41. Yes. And I'm trying to trace those down. Where are they? Well, the basis for my belief of that is that there is really no issue before, no basis upon which the board can say that those claims are not patentable, because they already said that those references do not suggest the memoization technique. Well, 20 and 41 were rejected in the original opinion. Right. Presumably because they dealt with memorization. Memorization, right. The board later says, oops, we misread. But they never resurrected 20 and 41, did they? Right. That's right. That's correct. Now, the other aspect is before you do run out of time, you did not request a reconsideration of claims 20 and 41. I don't believe we had to, because once the board decided that memoization was not described or suggested by the combination of references, there's no real basis for the board to hold the claim not patentable. But if you did not request reconsideration, is that really before us? Well, we requested reconsideration of claim 9 and claim 29. Are you required by the rules? I must say I tried to find the rule on this and didn't succeed, and that may be my problem. Are you required by the rules to request reconsideration in order to get it to us? I believe that because the way the board framed the issue that we are entitled to those four claims, and that the Federal Circuit, at the very least, should request it. My question is, did you have to ask for reconsideration before you can come to us? I don't believe that we have to. Okay. I'm going to ask the government the same question. I haven't been able to find the answer. I don't believe we have to. Okay. You're well into your rebuttal time. You want to save some time for rebuttal? I'd like to just have one more minute, and I'd like to just discuss claim 2. So in claim 2, the board acknowledged that the combination of references didn't recite a hash table and went out and found a reference that basically described hash files and used another reference, Tremblay, to come up with a concoction of how one of art and skill in the art would combine these five references to arrive at claim 2. However, what they actually arrived at was not what we actually claimed in claim 2. So even though they, in our view, came up with a rejection, which is not supported by any evidence of record by a series of attenuated inferences, they did not, in any event, come up with the invention as claimed in claim 2. Is concoction a witch's brew, is that what you're saying? Pardon me? Concoction is a witch's brew? Yes. Thank you. We'll restore two minutes of your rebuttal time. Thank you very much. Mr. Johnson? Mr. Johnson, save enough time, however you plan to make your argument, to help us understand where all these claims have gone to, but proceed in whatever order you want to. Certainly, Your Honor. May it please the Court, there is substantial evidence supporting the Board's finding that the claims at issue are unpatentable because they are obvious. With respect to the first limitation, the processing step that is in claim 1, determining interior cities that appear with gateways is found in the record. As this Court noted, Gardner does include storing published information, and ultimately it does use that stored information to construct a fare for an itinerary. But does it include the first determining step? Well, part of the information, the calculation that takes place for determining an unpublished fare, includes finding out what the arbitrary is and what the published fare is, and that's what's taught in APCA. APCA teaches the process of coming up with a constructed fare based upon an arbitrary and a published fare. So Gardner relies upon the processing that takes place in APCA when it stores the information from APCA, when it comes up with the ultimate calculation for an itinerary. But does APCA really disclose the particular aspects of the itinerary itself, the calculation of the itinerary, or the fare? What it does discuss, Your Honor, is what is claimed. If you... APCA goes... Are you referring to claim one? Yes, Your Honor. APCA explains the process, the preprocessing process that it goes through at 1146. There it explains that in order to come up with the arbitrary information, you first start with getting an arbitrary, and then you read the origin side of the arbitrary records from the arbitrary master, and you also read the destination side of the arbitrary records. And an arbitrary is simply an interior city and a gateway city. And so as part of the preprocessing that takes place in APCA, you necessarily will have the interior city as a part of that analysis. And that is the information that Gardner relies upon in determining the calculation for an itinerary. With respect to the second step, which is searching for the published fares, again, because Gardner is relying upon the processes from APCO, there is necessarily searching for the published fare that APCO has generated as part of the process. And counsel has argued that ultimately the applying step is not found in the references either. Well, Gardner does disclose the constructed fare, and it goes through the process and relies upon the process that APCO came up with, which is determining the arbitrary amount and determining the published fare amount. Once there is a match between the gateway city in the arbitrary and a gateway city in the published fare, then a constructed fare can then be determined based upon the arbitrary amount and the published fare amount. And that's what APCO ultimately goes through that process when it comes up with the constructed fare. And that is the third element in claim one. So in order to find the determining step, you're combining both Gardner and APCO. You have to combine the two. Yes, you do, Your Honor, because Gardner ultimately relies upon the analysis of the APCO analysis. So it doesn't go through the parade of horribles that opposing counsel alleges with respect to going through each and every airline that's in the country and each and every interior city that has an airport in order to come up with a calculation. APCO starts off with the determining interior city, and then it goes on to search for the published fare and ultimately comes up with the calculation. When does it pick up the gateway city at that point? The gateway city as part of step one? Step one. It picks it up on page 1146. At the first bullet there, you see that it states, read the origin side arbitrary. Is that the first step, though, that takes place? Yes, that's the preprocessing step. And although APCO calls it the origin city, that's really the gateway city. Well, it talks about a gateway table. Listing all of the gateway cities at that point? No, it's actually doing it, Your Honor, in the second bullet. It's getting the information in the first bullet, but it's actually making the determination in the second bullet. And the second bullet involves the gateway city. And the third bullet involves the interior city that's a part of the arbitrary. And that's the preprocessing analysis that APCO goes through. That's relevant to the first element in claim one. With respect to what happened procedurally, the board misinterpreted the particular term at issue. They thought it was memorization as opposed to memoization. And they acknowledged their error. They pointed out that the examiners made a search and that they made a search, and they couldn't find it. However, Mr. Baggett did not, in his request for recon, argue all of the claims that dealt with memoization. Claim nine was allowed by the board. That's correct. What about the other claims in the group four? Right. Which had the same term in the claim, which was an error recognized by the board. But claim 29 was also part of claim nine group. So that was not allowed. That's right. Is that error? So it should have been allowed. So nine and 29, they fall together because they are related. Or rise together. That's right. So 29 should have been allowed. 29 should have been allowed as well. So it's the government's view that if we hypothetically were to affirm the board, the result of that is to allow nine and 29. Nine and 29, your honor. What about claims 20 and 41? For some reason, Baggett did not also request recon with respect to those claims, and they clearly included it. Did they need to request reconsideration? Is there some requirement that they do? With respect to arguments that are made in an initial appeal, the board only addresses arguments that are presented to it. And so if an argument is not made and it's in the initial appeal to the board, then the board does not have to address it. It doesn't have to create arguments for the applicant and then address them, build up a straw man just to knock them down. But they did request reconsideration of nine. Just claim nine. But what about the others? Reconsideration is not required under the rules, is it? Because it was before the board. Those two claims were before the board on direct appeal. That's right. No, reconsideration is not a requirement. It's up to the applicant to make such a request if he or she decides to do so. But if they did not request reconsideration of the other two claims, can they still rely on the original appeal? Well, the board will only address arguments before. And if they didn't raise those arguments in their request, then there was nothing for them to address. 20 and 41 were rejected in the original appeal, but presumably erroneously because of the memorization, memoization issue, which is very interesting that the board couldn't find any prior art in memoization, which almost anyone could by just going on Google, but that's besides the point. The point is that 20 and 41 were rejected, but for the wrong reasons. But then that's where they sit, apparently, because Mr. Maloney didn't ever ask for correction for that. So I'm trying to sort out in my mind what will happen to those. Under Rule 41.52, the board will only address those arguments that are raised in the request. So they say they stay rejected. Is that right? Because they were not reconsidered. That's correct. They stand as rejected. That's correct. In other words, he acquiesced to. So the appeal could still be taken from the original rejection by the board. Claims 20 and 41. 20 and 41, that's right. They could still be appealed to us because they stand rejected under the original appeal. Assuming that time restraints are allowable and other procedural aspects. Isn't there some sort of race judicata issue going on here? Whether or not they go back and pick up something. And that was a central part of this case that's now been litigated and presumably will be decided. Can they go back and reopen it? That's an interesting question, Your Honor. I would hope so. What is the answer? What would you propose the answer to be? I would think that because they failed to follow the rules, which would have required them to raise any argument that they felt needed to be addressed by the board in their request for recon, that they have waived all arguments for those particular, with respect to those particular issues. We shouldn't be surprised then if that's the government's position. Is that right? No, not too much, Your Honor. The appendix at A2 is confusing me because it says, this is the decision on the request for rehearing. It says in line 4, 5, 6, 7, an appellant seeks reconsideration of the decision to affirm their rejection of claims including claim 20 and 41. I'm sorry, which line are you reading from, Your Honor? A2 lines 5 and 6 refer to claims 20 and 41. And it says the full sentence says the appellant seeks reconsideration of the decision to affirm the rejection of claims 20 and 41, including others, and seeks withdrawal, et cetera. So now I'm confused as to why we're discussing this as if claims 20 and 41 were not the subject of reconsideration. Only because when you look at what they ultimately addressed argument-wise in the request for reconsideration, It didn't relate to their memoization. That's right. And it didn't relate to certain claims. It only related to claim 9. On the other hand, the issues, if you look at the blue brief, the statement of the issues on appeal, page 3, paragraph 3, dealing with group 4 claims, they say that one of their issues on appeal is whether the board, after acknowledging that the prior art neither disclosed nor suggested memoization, erred by failing to allow claims reciting memoization. They do not, in their brief, then ever really quite sort this out. But nevertheless, I'm trying to figure out whether they have failed to raise this somewhere along the line, or what happened to those. Anyway, the government's brief was not very helpful, I'm sorry to say, on that issue. But I can understand why. No further questions? Thank you, Mr. Johnson. Mr. Maloney will restore three minutes if you need it. There's a couple of things I'd like to address. I believe under the rules which govern appeals to the Board of Appeals, we may request reconsideration of a decision of the board. We don't necessarily have to. And therefore, the fact that we may not necessarily request this explicitly, reconsideration of claims 21 and 41, I believe, should not waive our right to argue this before the Federal Circuit. Secondly, only because they were part of the original decision. Part of the original decision, part of our original briefs. And we believe that because the board admitted that the references did not teach memoization and the claims involving memoization were patentable, all those claims should have been patentable. But I'd like to get to the solicitor's argument. Essentially, the solicitor points to 1146. The first bullet, for example, get arbitrary origin points from the gateway table. Well, in my view, that does not suggest at all. It certainly does not describe the pre-processing step of claim one. And particularly the fact that they are talking about plural points would, in my view, actually teach away from what is actually being claimed in claim one. Because what we're trying to claim in claim one is a way of separating arbitrators according to cities. And the next thing I'd like to also discuss is going back to claim two. In claim two, we have a specific index that returns a specific result. And the board in this decision did not find either one of those two specific features of claim two. We would like to believe that both claims one and claim two are actually very broad claims. But in fact, they have very specific limitations on them. And those specific limitations were not found. Finally, the other thing I'd like to address is Gardner. Frankly, this case would have been much easier for both sides had Xamarin not used Gardner. Because Gardner really has nothing at all to do with making constructed fares. Gardner simply retrieves constructed fares that are stored in a memory or a database someplace. He doesn't teach retrieving a published fare and combining it with an arbitrary. That's not what Gardner is about. This discussion having to do with flights and itineraries has nothing at all to do with producing constructed fares. Constructed fares merely involve manipulation of certain types of data structures that are defined in ATPCO. And in a particular way to come up with a new data structure which represents an unpublished fare. It's that unpublished fare record which is stored in Gardner and is retrieved by Gardner and used in pricing itineraries for travel between two points. But Gardner has absolutely nothing at all to do with actually making these constructed fares. Thank you, Mr. Mone.